UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| CHAD J. JACKSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CAUSE NO. 1:11-CV-00279 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Chad Jackson appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.)  For the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Jackson first applied for DIB and SSI in April 2003 alleging that he became disabled as of September 15, 2002. (Tr. 173-75.)  The Commissioner denied his application initially, upon reconsideration, and after an administrative hearing before Administrative Law Judge ("ALJ") Stephen Davis. (Tr. 131-41, 152-67.)  After a timely request for review, however, the Appeals Council remanded the claim for a new hearing. (Tr. 113-15.)  After a second hearing, ALJ Davis issued a second unfavorable hearing decision. (Tr. 81-94.)  In response to Jackson's request for

---

[1] All parties have consented to the Magistrate Judge. (Docket # 13); *see* 28 U.S.C. § 636(c).

review, the Appeals Council sent the claim back for yet another hearing.[2] (Tr. 46-50.)

A third hearing was conducted on July 17, 2009, before ALJ Americanos, at which Jackson (who was represented by counsel); his mother; two medical experts, and a vocational expert ("VE") testified. (Tr. 858-92.) On November 2, 2009, ALJ Americanos rendered Jackson an unfavorable decision (Tr. 16-27), and after the Appeals Council denied Jackson's request for review, that decision became the final one of the Commissioner (Tr. 5-12).

Jackson filed a complaint with this Court on August 17, 2011, seeking relief from the Commissioner's final decision. (Docket # 1.) Jackson advances just one argument in this appeal—that the ALJ's finding at step five is not supported by substantial evidence because the hypothetical posed to the VE failed to account for his moderate deficiencies in concentration, persistence, or pace. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 13-16.)

## II.  FACTUAL BACKGROUND[3]

### *A. Background*

At the time of the ALJ's decision, Jackson was thirty-one years old; had a high school education with special education classes; and possessed work experience as a factory worker, grill cook, grocery stocker, kitchen attendant, and fast food worker. (Tr. 173, 187-88, 192.) Jackson alleges that he became disabled as of September 15, 2002, due to low back and knee

---

[2] On July 3, 2008, Jackson filed a second application for disability. (Tr. 49.) In its second remand order, the Appeals Council found that this remand rendered Jackson's second application "duplicative," and ordered ALJ Peter Americanos to "associate the claims files and issue a new decision on the associated claims." (Tr. 49.) Therefore, it is ALJ Americanos's November 2, 2009, decision that is the subject of Jackson's appeal.

[3] In the interest of brevity, this Opinion recounts only the portions of the 892-page administrative record necessary to the decision.

problems, depression, borderline intelligence, organic brain damage, and anxiety. (Opening Br. 2.) Jackson does not challenge the findings of the ALJ in regard to his physical condition. (Opening Br. 2 n.1.) Therefore, the Court will focus on the evidence pertaining to his mental limitations.

### B. *Jackson's Testimony at the Hearing*

At the July 17, 2009, hearing, Jackson testified that he lives with his wife, who is not employed outside the home, and three children, ages seven, six, and three. (Tr. 862.) He stated that after his back and knee issues, his low intelligence was his "next most serious problem" because it impacts his ability to learn and remember tasks. (Tr. 865, 868-69.) He reported that he could read and write, but "not very well"; he owns and drives a car. (Tr. 861, 874.) When asked how he spent the day prior to the hearing, Jackson reported that he took his children to the county fair for two hours. (Tr. 873.)

### C. *Summary of the Relevant Medical Evidence*

In October 1991, Jackson, who was thirteen years old at the time, was diagnosed with nicotine abuse and adjustment disorder NOS. (Tr. 301.) In December 1992, he was hospitalized with a diagnosis of major depression. (Tr. 248.) The results of a WRAT-R indicated that his reading level was at the beginning of the third grade, spelling level below the third grade, and arithmetic level at the beginning of the seventh grade; intelligence testing showed a performance IQ of 95, verbal IQ of 78, and full scale IQ of 85. (Tr. 248.) Problems with distractibility were noted. (Tr. 249.) Wayne Pribble, Ph.D., summarized that Jackson was in the low average range of intellectual functioning with clear deficits in verbal apprehension and likely a significant learning disability. (Tr. 250.) Dr. Pribble assigned Jackson a diagnosis of major depression with

3

significant anxiety experienced as psychological anxiety and low average intelligence. (Tr. 250.)

On March 19, 1994, Jackson underwent a neuropsychological examination by Bob Hatfield, Ph.D. (Tr. 253-57.) Jackson exhibited signs of anxiety, and his attention span and concentration were mildly to moderately impaired. (Tr. 254.) The MMPI results were similar to individuals who had difficulty controlling their impulses. (Tr. 254.) Jackson's ability to learn and apply new concepts when given feedback was mildly impaired. (Tr. 255-56.) Dr. Hatfield diagnosed Jackson with mild cerebral impairment. (Tr. 256.) In July 1995, Dr. Hatfield wrote a letter to Jackson's probation officer stating that he had been seeing Jackson for more than a year for counseling and group therapy; he also opined that observations, test results, and parental reports suggested a dual diagnosis of conduct disorder and attention deficit disorder. (Tr. 258.)

Jackson underwent a psychological evaluation on April 25, 1996. (Tr. 470.) On the WAIS-R, he had a verbal IQ of 74, a performance IQ of 96, and a full scale IQ of 81. (Tr. 471.) The Behavior Evaluation Scale-2 indicated an inability to learn that cannot be explained by intellectual, sensory, or other factors and a general pervasive mood of unhappiness or depression. (Tr. 471-73.) His teacher observed at school that he exhibited off-task behavior. (Tr. 473.)

In January 2000, Jackson was hospitalized for suicidal ideation. (Tr. 298.) He was diagnosed with depressive disorder NOS, partner relational problem, and a reading disorder. (Tr. 298.) He was assigned a current Global Assessment of Functioning Score ("GAF") of 51 upon admission and 60 upon discharge.[4] (Tr. 298.)

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

On December 13, 2002, Dr. Hatfield performed another psychological evaluation on Jackson. (Tr. 348-50.) At the time, Jackson lived independently, but his parents were managing his finances; his parents were driving him to and from his general labor job because his driver's license was "taken away" due to receiving an excessive number of speeding tickets. (Tr. 348.) Jackson was inattentive during the evaluation and did not appear to comprehend the instructions; questions had to be repeated and rephrased for him. (Tr. 349.) Dr. Hatfield found Jackson's cognitive functioning to be within the borderline range of intelligence with weaknesses in the areas of memory, social comprehension, vocabulary, and numerical reasoning skills. (Tr. 349.)

On June 16, 2003, Jackson was evaluated by Ceola Berry, Ph.D. (Tr. 292-95.) She assigned him a diagnosis of depressive disorder NOS and borderline intellectual functioning. (Tr. 295.)

On July 3, 2003, J. Pressner, a state agency psychologist, reviewed Jackson's record. (Tr. 261-78.) He found that Jackson had mild difficulties with daily living activities and social functioning and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 275.) More specifically, he opined that Jackson was moderately limited in the following areas of mental functioning: the ability to understand, remember, and carry out detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual; and complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 261-62.) Dr. Pressner concluded that although Jackson would have trouble with more complex tasks or those that would require him to read or write, he had the ability to complete "short, simple repetitive tasks." (Tr. 263.) Dr. Pressner's opinion was later affirmed by R. Klion,

5

Ph.D., a second state agency psychologist. (Tr. 265.)

On August 28, 2008, Jackson was re-evaluated by Dr. Hatfield. (Tr. 542-45.) Jackson's performance on the Luria-Nebraska Neuropsychological Battery Form I was in the moderate to severely impaired range of functioning; areas of impairment included receptive and expressive language, writing, memory, and intellectual processes. (Tr. 544.) Jackson also showed significant deficits on tasks that required him to follow multi-step directions, sequence motor movements, and answer complex questions, and a mental status exam showed deficits in short and long-term memory. (Tr. 544-45.) Dr. Hatfield opined that Jackson "might have difficulties maintaining a job due to his overall functioning as well as memory and receptive language deficits." (Tr. 545.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or

substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

### IV.  ANALYSIS

#### *A.  The Law*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On November 2, 2009, ALJ Americanos rendered his opinion. (Tr. 16-27.) He found at step one of the five-step analysis that Jackson had not engaged in substantial gainful activity since his alleged onset date. (Tr. 18.) At step two, the ALJ concluded that Jackson had the following severe impairments: "back problems [and] knee problems with chondromalacia in the right knee." (Tr. 18.)

At step three, the ALJ determined that Jackson's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 18-19.) Before proceeding to step four, the ALJ determined that Jackson's testimony of debilitating limitations was not credible and that he had the following RFC:

> [T]he claimant has the residual functional capacity to perform light work . . ., except no work at unprotected heights or around dangerous moving machinery; only simple and repetitive tasks[,] no frequent reading of written texts.

(Tr. 20.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Jackson was unable to perform any of his past relevant work. (Tr. 25-26.) The ALJ then found at step five that Jackson could perform a significant number of other jobs within the economy, including housekeeper, packer, assembler, light and electronics assembler, and packager. (Tr. 26.)

Therefore, Jackson's claims for DIB and SSI were denied. (Tr. 27.)

### C. The ALJ's Step Five Finding Is Supported by Substantial Evidence

In his sole argument on appeal, Jackson contends that the ALJ erred at step five when posing a hypothetical to the VE, maintaining that the ALJ failed to include his earlier finding that Jackson had moderate deficiencies in concentration, persistence, or pace. Jackson's argument, however, fails to warrant a remand of the Commissioner's final decision.

To explain, at step two of the five-step sequential analysis, the ALJ must determine whether a claimant's impairment(s) are "severe." 20 C.F.R. §§ 404.1520, 416.920. In determining the severity of a claimant's mental impairments at step two of his five-step analysis, the ALJ addresses the claimant's degree of functional limitation in four "broad functional areas": activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3); *see Jones v. Massanari*, No. 01-C-0024-C, 2001 WL 34382025, at *13 (W.D. Wis. Oct. 18, 2001). The Seventh Circuit Court of Appeals has stated that the ALJ must then "incorporate" these limitations into the hypothetical questions posed to the VE at step five. *Kasarsky v. Barnhart*, 335 F.3d 539, 543-44 (7th Cir. 2003) (holding that the ALJ erred when neither his RFC nor his hypothetical question to the VE "t[ook] into account" his finding at step two that the claimant had deficiencies in concentration, persistence, and pace); *see also O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). Stated more broadly, "to the extent the ALJ relies on testimony from a vocational expert, the question posed to the expert must incorporate *all* relevant limitations from which the claimant suffers." *Kasarsky*, 335 F.3d at 543 (emphasis added).

At step two, the ALJ found that Jackson had moderate difficulties in maintaining

concentration, persistence, or pace, as well as mild difficulties with activities of daily living and in maintaining social functioning. After determining that Jackson's mental impairments were not severe enough to meet a listing-level impairment, the ALJ assigned him an RFC limiting him to "simple and repetitive tasks." (Tr. 20.) Here, contrary to Jackson's assertion, the ALJ adequately accounted for his deficiencies in concentration, persistence, and pace by assigning him an RFC that limited him to "simple and repetitive tasks," a limitation that was properly incorporated into the ALJ's hypothetical to the VE. (*See* Tr. 890.)

Significantly, in assigning the RFC the ALJ reasonably relied upon the opinion of Dr. Pressner and Dr. Klion, the state agency psychologists, who reviewed Jackson's record and concluded that although he had moderate difficulties in maintaining concentration, persistence, or pace, he could still perform "short, simple repetitive tasks." (Tr. 261-63, 275.) The ALJ also relied upon the opinion of Dr. Brooks, the medical expert who reviewed Jackson's record and testified at the hearing that he could perform "simple and repetitive tasks." (Tr. 884.) The instant circumstances, therefore, are analogous to the facts confronting the Seventh Circuit in *Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002), and distinguishable from those presented in *Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011).

In *Johansen*, the ALJ determined that the claimant was moderately limited in his ability to maintain a regular schedule and attendance and in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms. 314 F.3d at 288-89. In posing a hypothetical to the VE, the ALJ relied upon the opinion of a consulting physician who stated that because the claimant was not significantly limited in seventeen of twenty work-related areas of mental functioning, he retained the mental RFC to perform "low-stress,

repetitive work." *Id.* The Court of Appeals concluded that the ALJ's limitation to low-stress, repetitive work adequately incorporated Johansen's moderate mental limitations, articulating that the consulting physician had essentially "translated [his] findings into a specific RFC assessment, concluding that Johansen could still perform low-stress, repetitive work." *Id.*; *see also Milliken v. Astrue,* 397 F. App'x 218, 221-22 (7th Cir. 2010) (unpublished) (affirming ALJ's step five finding where a medical expert opined that despite claimant's difficulties in concentration, persistence, or pace, she could still perform unskilled work); *Howard v. Massanari*, 255 F.3d 577, 581-82 (8th Cir. 2001) (concluding that the ALJ adequately captured the claimant's deficiencies in concentration, persistence, or pace in his RFC that limited the claimant to simple, repetitive tasks, in part because the state agency psychologist concluded in his functional capacity assessment that the claimant could sustain sufficient concentration and attention to perform simple, repetitive, and routine activity); *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).

Jackson, however, contends that the instant facts are more analogous to those presented in *Jelinek*, 662 F.3d at 814, in which the Seventh Circuit found that a limitation to "sedentary" and "light" unskilled work was not sufficient to accommodate deficiencies in the claimant's ability to maintain regular work attendance, carry out instructions, and deal with the stresses of full-time employment. Yet, Jackson acknowledges that there is no indication in the *Jelinek* opinion that the state agency psychologists actually articulated that the claimant could perform simple, repetitive tasks like Drs. Pressner, Klion, and Brooks did here. (Reply Br. 2.) Of course, "[t]he regulations, and this Circuit, clearly recognize that reviewing physicians and psychologist[s] are experts in their field and the ALJ is entitled to rely on their expertise."

*Ottman v. Barnhart*, 306 F. Supp. 2d 829, 839 (N.D. Ind. 2004) (citing 20 C.F.R. § 404.1527(f)(2)(i)).  Therefore, *Jelinek* is distinguishable from the instant circumstances.[6]

Like the consulting physician in *Johansen*, Drs. Pressner, Klion, and Brooks each essentially "translated [his] findings into a specific RFC assessment," 314 F.3d at 288, concluding that despite Jackson's moderate difficulties in maintaining concentration, persistence, or pace, he could still perform work involving simple, repetitive tasks.  As a result, substantial evidence indicates that the hypothetical posed by the ALJ to the VE at step five adequately conveyed Jackson's mental limitations.  Therefore, Jackson's sole argument on appeal does not necessitate a remand of the Commissioner's final decision.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Jackson.

SO ORDERED.  Enter for this 18th day of July, 2012.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

---

[6] The instant facts are also distinguishable from those presented in *O'Connor-Spinner*, 627 F.3d at 617-18. There, the ALJ failed to incorporate all of the mental limitations assigned in the RFC into the hypothetical posed to the VE at step five. *Id*.  Here, the hypothetical posed by the ALJ to the VE at step five adequately reflects all of the limitations assigned in the RFC. (*Compare* Tr. 890, *with* Tr. 20.)